KESHISHIAN & CO. *v.* UNITED STATES (No. 2101).[1]

1. GLOVE LEATHER.

The provision of paragraph 359, tariff act of 1913, contemplates a leather so far advanced in manufacture as to commit it to the making of gloves, and does not include a leather which is suitable for use as a material from which leather for glove making may be manufactured. Merchandise is classified with reference to its condition at importation, and not with reference to what it may become as the result of manufacturing processes applied subsequent to importation.

2. LAMBSKINS, ALUM TANNED, ARE NOT GLOVE LEATHER.

Alum-tanned lambskins, shown to be unfit for use for making gloves until after considerable further advancement and shown also to be fit for various other uses after the application of the respective manufacturing processes appropriate to such uses, can not be regarded as "glove leathers" under paragraph 359, tariff act of 1913. They are free of duty under paragraph 530 as leather not specially provided for.

---

[1] T. D. 38961.

United States Court of Customs Appeals, December 14, 1921.

APPEAL from Board of United States General Appraisers, G. A. 8413 (T. D. 38630).

[Reversed.]

*Allan R. Brown* for appellants.

*Wm. W. Hoppin*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

[Oral argument Oct. 26, 1921, by Mr. Brown and Mr. Lawrence.]

Before DE VRIES, Presiding Judge, and SMITH, BARBER, and MARTIN, Associate Judges.

SMITH, Judge, delivered the opinion of the court:

Alum-tanned lambskins were classified by the collector of customs as glove leather and were assessed for duty at 10 per cent ad valorem under that part of paragraph 259 of the tariff act of 1913, which reads as follows:

359. * * * glove leathers, 10 per centum ad valorem.

The importers protested that the importation was not glove leather and claimed that it was free of duty under that part of paragraph 530 of the tariff act which provides as follows:

FREE LIST.

530. All leather not specially provided for in this section. * * *

The Board of General Appraisers overruled the protest and the importers appealed.

The testimony submitted by the importers was to the effect that the term "glove leather" meant to the trade a leather finished and ready for glove making, and that in the trade the importation would not be called "glove leather."

The witnesses for the importers testified that alum-tanned leather was ultimately used not only for the making of gloves, but also for the manufacture of skivers, belts, babies' shoes, baseball covers, pocketbooks, the outside of bags, and bindings for books. These witnesses were all agreed that in its imported condition the leather was unfit for the making of gloves and that, to make it suitable for that class of work, it would be necessary, first, to free the skins of the alum and salt; second, to treat them with a mixture of egg yolk, flour, and water; and, third, to mellow or soften them by staking or drawing them over a blunt knife or "knee." The skins after being so treated and dried would have to be softened by covering them with dampened sawdust and by again staking them. It further appeared from the testimony introduced by the importers that leather not cleared of the excess alum and salt and not egged, is wholly unfit for the making of gloves, not only because it becomes hard and stiff as time passes, but because the excess tannage if not washed out, in addition to preventing the effective coloring of the material, rots the

thread used in sewing into a glove the forms or pieces cut from the leather. The testimony for the importers was positive that the alum-tanning of leather did not commit it to the making of gloves and in that they seemed to be supported by the authorities.—The Principles of Leather Manufacture (Procter) 194 at 196. See "Tawing," under head of "Leather," Encyclopedia Britannica (11th edition). See "Tawing" under head of "Leather," The New International Encyclopedia.

On behalf of the Government the witnesses Smith, White, Shew, Karch, and Robinson testified that the term "glove leather" had a definite, uniform, and general meaning in the trade, and that the exhibits representing the importation were "glove leather," as that designation was understood in the trade. Smith, a manufacturer of leather, admitted, however, that "glove leather" had to be washed, treated with flour and eggs, and then dried and staked. On cross-examination he stated that *unfinished "glove leather" in the trade is a leather which must be washed and egged, and that skins do not become "glove leather" until they are finished up.* He was of the opinion, however, that all three exhibits had been treated with alum, salt, eggs, and flour.

White, a manufacturer of leather and gloves, said that softness, pliability, and "stretchiness" were the characteristics of glove leather, and that as the exhibits possessed those characteristics they were suitable for the making of gloves. On cross-examination, however, he acknowledged that an excess of salt and alum in the leather "would rot the threads of the gloves," and that such leather "would take the dye unevenly." Moreover, according to this witness, excess tannage "would attract moisture and make spots if finished in the white." Nevertheless, in his judgment the exhibits were fit for manufacturing purposes and would produce a reputable glove. *He said that "glove leather" in the trade did not mean leather ready for the glove makers' use, and that leathers containing an excess of alum and salt were nevertheless "glove leather" in the trade if limed, beamed, and tanned for that purpose, even if unfit for the glove makers' use.*

Shew, a manufacturer of glove leather, said that the *term "glove leather" as used in the trade referred to leather ready for the glove makers' use, with the exception of shaving and dyeing.* In other words, in the trade "glove leather" meant a leather completely finished by the tanner. He was of the opinion, however, that Exhibits 1, 2, and 3 could be cut into gloves just as they were, and that they did not require further treatment by the tanner.

Karch, importer of hides, skins, and glove leather, declared *that the exhibits were processed so as to make them pliable and soft enough or "glove leather" provided they had been finished up.* He said that on an order for glove leather he had made deliveries of glove leather

containing an excess of salt and an excess of alum, but could not say that leather in that condition had been made up into gloves. He said that Exhibits 1 and 2 appeared to have been washed or partially washed; that Exhibit A did not seem to have been washed. On cross-examination he stated that the deliveries of unfinished leather referred to on direct examination were made on an order for *white glacé skins* and that the term "glove leather" was not used, but understood. *On an order for "glacé skins," leather which had not been washed, egged, or staked would be delivered, it being understood that white glacés should be washed if there was an excess of alum and that that was "entirely up to the purchaser to find out." Buyers were warned, however, that it was better to wash the skins, although he had known of customers taking an Italian leather similar to the samples and making it up into gloves without washing, egging, or staking, and "they seemed to have gotten along all right," although he did not approve of that.* He said that Exhibits 1, 2, and A were white "glacé leather," and that white glacé leather was not washed as it came from Europe, but was later manufactured here. He would not say that prior to October, 1913, there was on the market any unfinished "white glacé Italian;" that is to say, unfinished to the extent that it required washing, egging, and staking.

Robinson, a manufacturer of glove leather, testified on the part of the Government that "glove leather" was a soft, mellow, pliable piece of leather that will stretch and fit the hand; a leather dressed for the purpose to make it mellow and pliable. He was of the opinion that Exhibits 1, 2, and A were ready for the glove makers' use, although they could be given a far different appearance by dampening and staking them. He stated that the shaving and dyeing of gloves was done by the glove makers and not the tanners.

The Board of General Appraisers held, first, that a special commercial meaning for the term "glove leather" was not established; second, that any leather, whether finished or not, deliberately processed and prepared for *ultimate* use in glove making was glove leather. In the opinion of the board the use of such a leather for shoe uppers or other purposes was an exceptional use and therefore did not determine classification.

We agree with the board that the evidence submitted did not warrant a finding that the designation "glove leather" had a meaning in the trade different from that accorded to it by people in general, but we can not accept the board's conclusion of law that the classification of the merchandise must be determined by its chief use, not in its condition as imported, but its chief use after having been advanced to a new condition by manufacturing processes applied subsequent to importation and which adapted it to the making of gloves.

If the merchandise had been advanced to the point where it was ready for use as glove leather and if leather so advanced were chiefly used for making gloves, then it might possibly have been classified as "glove leather," notwithstanding a minor or incidental use for other manufactures. But the skins *as imported* were not suitable for the manufacture of gloves. Indeed, as they came into this country they were no more committed to the making of gloves than they were to the making of skivers, belts, pocketbooks, baseball covers, babies' shoes, bindings for books, or the outside of bags.

Before the skins could be used as a "glove leather" they had to be cleansed of the excess alum and salt to prevent the rotting of the threads of the gloves and then treated with eggs and flour and staked to produce the softness, pliability, and "stretchiness" necessary for that special class of leather. For the manufacture of skivers they had to be split. For the making of babies' shoes they had to be washed and colored, then egged and staked to render them soft and pliable, and next tacked, glazed, or ironed in order to give them "firmness," the exact reverse of the quality required for gloves.

From this it is apparent that the leather as imported is not a leather chiefly used for the manufacture of gloves, but a *material* which at best is chiefly used for the manufacture of *glove leather.* Whether merchandise such as the importation is to be a glove leather or a leather destined for some other use depends entirely on the purpose for which it is purchased and the processes of manufacture to which it is subjected after it arrives in the country. Unquestionably it was tanned so that it could be used for the manufacture of "glove leather," but it was also tanned so that it could be manufactured into a leather for baby shoes, belts, pocketbooks, covers for the outside of bags, and bindings for books.

In our opinion, the preponderance of the testimony in this case establishes that the leather was not sufficiently advanced to commit it to the making of gloves, and therefore it was not "glove leather," which means in its ordinary acceptation not a material for making glove leather, but a leather suitable for the making of gloves.

The decision of the Board of General Appraisers is therefore *reversed.*